NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| CONSTANCE OGUGUO and NKECHI OSUJI, | : : : : | Civil Action No. 14-2383 (SRC) |
| Plaintiffs, | : : | OPINION |
| v. | : : |  |
| WELLS FARGO BANK, NA, PNC BANCORP, INC., METAL BUILDING, ASSOCIATES, INC., MICHAEL A STEPHENS, and JOHN DOES 1-50, | : : : : : |  |
| Defendants. | : : |  |

**CHESLER**, District Judge

This matter comes before the Court upon the motions for summary judgment filed by Defendant Wells Fargo Bank, N.A., and Defendant PNC Bank, N.A.,[1] pursuant to Federal Rule of Civil Procedure 56 [Docket Nos. 54 and 55]. *Pro se* Plaintiffs Constance Oguguo and Nkechi Osuji have opposed the motions. The Court has considered the papers filed by the parties. For the reasons that follow, the court will grant in part and deny in part Wells Fargo's motion. The Court will grant PNC's motion.[2]

---

[1] Plaintiffs improperly identified PNC Bank, N.A. as PNC Bankcorp, Inc.
[2] PNC's motion for summary judgment asks the Court to dismiss all claims of the *pro se* Plaintiffs. PNC's notice of motion does not specify that PNC's motion extends to Wells Fargo's cross-claims. Only in passing reference does PNC's brief request relief on the cross-claims. Judgment on the cross-claims is also sought in PNC's proposed order. This is not sufficient to provide Wells Fargo notice that PNC's motion for summary judgment affects its cross-claims against PNC. Wells Fargo's submissions, which make no arguments on the cross-claims, suggest that Wells Fargo did not understand PNC's motion to apply to it. Because PNC's moving papers do not clearly identify that the motion

1

**I.  BACKGROUND**

Plaintiffs seek reimbursement of $160,645 withdrawn from the Wells Fargo account of Nkechi Osuji to pay six allegedly forged checks between May and July 2012. On March 28, 2012, Osuji opened a checking and savings account with Wells Fargo bank. Osuji funded each account with a $100 deposit and ordered checks, which she testified she never received.[3] (Osuji Dep. 63:15-21.) Following these set-up transactions, the account saw no activity until May 10, 2012, when Osuji's sister, Constance Oguguo, deposited $70,000. Over the course of the next two months, Oguguo made additional contributions, in all, totaling $160,150.[4] Although Oguguo provided all the money other than the initial $100, Osuji was the sole account holder and authorized signatory.

Also in March 2012, Defendant Michael Stephens, the vice president of Metal Building Associates, Inc., opened a Business Enterprise Checking account for the company at PNC Bank. Between May 25, 2012, and July 27, 2012, six checks ostensibly issued by Osuji to Metal Building Associates were deposited into the PNC account. Wells Fargo paid all six:

| No. | Date Paid | Amount |
|-----|-----------|--------|
| 103 | 5/25/12 | $80,000 |
| 107 | 6/8/12 | $24,000 |
| 111 | 6/25/12 | $1,000 |
| 129 | 7/17/12 | $25,000 |
| 133 | 7/18/12 | $25,345 |
| 135 | 7/27/12 | $5,300 |

---

extends to the cross-claims, PNC's motion for summary judgment is applicable to Plaintiffs' claims only. If PNC wants the Court to consider its arguments for judgment on Wells Fargo's cross-claims, it must file a separate motion.
[3] New Jersey Local Civil Rule 56.1 requires parties on summary judgment motions to furnish a statement identifying material facts to enable the Court to determine whether a genuine dispute exists. The opposing party must respond to each paragraph of the movant's statement and support any disagreement by citing evidence in the record. Any material fact not so disputed can be deemed undisputed for purposes of the summary judgment motion. Plaintiffs have not filed a responsive statement. However, the Court is mindful that Plaintiffs are *pro se* litigants, and district court judges often relax procedural rules for an unrepresented litigant. *Tukes v. Hayman*, 10-cv-0098, 2011 WL 915382, at * 6 (D. N.J. Mar. 9, 2011). In these circumstances, the Court may draw relevant facts from the record, including a plaintiff's deposition testimony. *See Jordan v. Allgroup Wheaton*, 218 F. Supp. 2d 643, 646 (D. N.J. 2002).
[4] Some of the funds were wire transferred from Nigeria. Oguguo testified that her brother sent the money to repay a loan to Oguguo. (Oguguo Dep. 114:1-115:15.)

Osuji denies authorizing these transactions.

Osuji allegedly had no knowledge of these checks until a Wells Fargo representative called her about an overdraft on August 14, 2012. Surprised by the negative balance when she expected no withdrawals, Osuji drove to a Wells Frago branch the next morning and filed an Affidavit of Check Fraud after reviewing a printout of her account activity. Wells Fargo initiated an investigation but denied Osuji's claim because she took too long to report the fraud. In a letter dated September 18, 2012, Wells Fargo explained that Osuji's Customer Account Agreement requires notice of unauthorized transactions within thirty days from the date that the bank mails, or otherwise makes available, an account statement. The Agreement also disclaims liability for future transactions by the same wrongdoer that could have been prevented by timely notice. Osuji asserts that she never received monthly statements.[5]

Failing to secure reimbursement from Wells Fargo, Osuji and Oguguo commenced litigation on or around August 21, 2013, in the Superior Court of New Jersey for Essex County. PNC removed this case to federal court on April 14, 2014. The operative Second Amended Complaint brings claims for violations of various UCC provisions against Wells Fargo and PNC and a cause of action for breach of contract against Wells Fargo.[6] Wells Fargo has filed cross-claims against PNC, including for breach of transfer and presentment warranties. This matter is before the Court upon the motions for summary judgment filed by Wells Fargo and PNC.

---

[5] Other than the checks that were ordered on March 28, 2012, and the statements, it appears that Osuji received all other mail from Wells Fargo that was sent to the same address. (Osuji Dep. 74:3-75:11, 76:15-79:16, 102:1-6, 125:3-7.)

[6] Michael Stephens and Metal Banking Associates, Inc. are also Defendants in this case. However, because Plaintiffs have never served or located these Defendants, only the claims against Defendant Banks are at issue.

## II. DISCUSSION

### A. Legal Standard for Summary Judgment

Federal Rule of Civil Procedure 56(a) provides that a "court shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (construing the similarly worded Rule 56(c), predecessor to the current summary judgment standard set forth in Rule 56(a)). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. "When the moving party has the burden of proof at trial, that party must show affirmatively the absence of a genuine issue of material fact: it must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." *In re Bressman*, 327 F.3d 229, 238 (3d Cir. 2003) (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1438 (11th Cir. 1991)). In considering a motion for summary judgment, a district court "must view the evidence 'in the light most favorable to the opposing party.'" *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). It may not make credibility determinations or engage in any weighing of the evidence. *Anderson*, 477 U.S. at 255; *see also Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (holding same).

4

Once the moving party has satisfied its initial burden, the party opposing the motion must establish the existence of a genuine issue as to a material fact. *Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103, 1109 (3d Cir. 1985). "A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial." *Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001), overruled on other grounds by *Ray Haluch Gravel Co. v. Cent. Pension Fund of the Int'l Union of Operating Eng'rs and Participating Emp'rs*, 134 S.Ct. 773 (2014). However, the party opposing the motion for summary judgment cannot rest on mere allegations; instead, it must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990) (holding that "unsupported allegations in [a] memorandum and pleadings are insufficient to repel summary judgment").

### B. Claims Against Wells Fargo

The UCC allocates losses on forged checks between the customer and her bank. Initial liability falls on the bank, which is prohibited from charging against customer accounts items that are not "properly payable," that is items that are not "authorized by the customer" and/or not "in accordance with an agreement between the customer and bank." *N.J.S.A.* 12A:4-401. "An item containing a forged drawer's signature . . . is not properly payable," requiring a bank that pays such an item to recredit the customer's account. *Id.* cmt. 1; *Lor-Mar/Toto, Inc. v. 1st Constitution Bank*, 871 A.2d 110, 115 (N.J. Sup. Ct. App. Div. 2005) (quoting 2 James J. White & Robert S. Summers, *Uniform Commercial Code* § 21-3 at 363 (4th ed. 1995)). However, the loss may be shifted to the customer if she fails to promptly review her bank statements and report unauthorized transactions. *See N.J.S.A.* 12A:4-406.

5

> c. If a bank sends or makes available a statement of account . . . the customer must exercise reasonable promptness in examining the statement or the items to determine whether any payment was not authorized because of an alteration of an item or because a purported signature by or on behalf of the customer was not authorized. If, based on the statement or items provided, the customer should reasonably have discovered the unauthorized payment, the customer must promptly notify the bank of the relevant facts.
>
> d. If the bank proves that the customer failed, with respect to an item, to comply with the duties imposed on the customer by subsection c. of this section, the customer is precluded from asserting against the bank:
>
>> (1) the customer's unauthorized signature or any alteration on the item, if the bank also proves that it suffered a loss by reason of the failure; and
>>
>> (2) the customer's unauthorized signature or alteration by the same wrongdoer on any other item paid in good faith by the bank if the payment was made before the bank received notice from the customer of the unauthorized signature or alteration and after the customer had been afforded a reasonable period of time, not exceeding 30 days, in which to examine the item or statement of account and notify the bank.

*Id.* If a customer is precluded from asserting an unauthorized signature based on this section, the claim may nevertheless proceed if "the customer proves that the bank failed to exercise ordinary care in paying the item" or "[i]f the customer proves that the bank did not pay the item in good faith[.]" *Id.*

Parties may vary the UCC obligations by contract, as long as the bank does not disclaim "responsibility for its lack of good faith or failure to exercise ordinary care or limit the measure of damages for" its failures. *N.J.S.A.* 12A:4-103 and cmt. 1. The agreement may, however, "determine . . . the standards by which the bank's responsibility is to be measured" as long as "those standards are not manifestly unreasonable." *N.J.S.A.* 12A:4-103.

6

Osuji's Customer Agreement required her to challenge unauthorized transactions "[w]ithin 30 days after the Bank mails or otherwise makes account related information available," specifying that the failure to do so will release the bank "from all liability for the items charged to [the] account . . . ." (Agreement at p. 8.)

The Agreement also prevented Osuji from disputing transactions by the same wrongdoer if timely notification could have prevented the fraud:

> [I]f you fail to notify the Bank of an *unauthorized transaction* on your account within 30 days after the Bank mails, sends electronically, or otherwise makes available to you the statement or other account related information containing information describing the *unauthorized transaction*, the Bank will not be liable to you for any *unauthorized transactions* committed by the same person on your account that could have been prevented if you had complied with your obligations under this subsection.

(*Id.* at p. 9) (emphasis in original).

As a threshold matter, Osuji's obligation to timely report unauthorized transactions is predicated upon the availability of statements that would have allowed her to reasonably identify the fraudulent items. *See N.J.S.A.* 12A:4-406 and cmt. 1. Wells Fargo has submitted evidence that it provided statements to Osuji, initially online, and then online and by mail. (Abatemarco Decl. ¶¶ 5, 6.) The record demonstrates that upon opening her account, Osuji enrolled in online banking and elected to receive online statements. (*Id.* ¶ 5.) In accordance with these preferences, Wells Fargo indicated that it electronically offered the May 10 to June 11, 2012, statement, which disclosed the first two fraudulent checks (paid on May 25 and June 8). (*Id.* and Ex. G.) Commencing with the statement for the period from June 12, 2012 to July 11, 2012, Osuji opted for mail delivery. (*Id.* ¶ 6 and Ex. D.) Wells Fargo certified that it mailed the July statement to

7

the address that Osuji specified in her account application and also continued to post the statements online. (*Id.* ¶ 6.)

Plaintiffs have disputed the availability of statements in the Second Amended Complaint and their opposition brief, but unsupported allegations will not defeat a motion for summary judgment. *See Schoch*, 912 F.2d at 657. To raise a genuine issue of material fact, Plaintiffs must present actual evidence. *See Gleason*, 243 F.3d at 138; Fed. R. Civ. P. 56(c). Their unsubstantiated assertions have no basis in, and are contradicted by, the record, including copies of the statements submitted by Wells Fargo. (*See* Abatemarco Decl. Exs. D, G.) Osuji has never attempted to log on to her account online, testifying that she was "busy [with] school, work, private life," and "wasn't paying attention[.]" (Osuji Dep. 61:3-18.) Failure to access her statements is not grounds to assert that the statement for the period ending on June 11, 2012, which she chose to receive electronically, was not available.

Osuji also presents no evidence to dispute Wells Fargo's mailing of the subsequent statement. Although she testified that she never received it, Wells Fargo's mailing of the statement completes its obligation to make the statement available. *See N.J.S.A.* 12A:4-406(c). The same diligence demanded of Osuji to review her statements mandates her to inquire if the statements have not been delivered. Thus, in the absence of proof to the contrary, the Court accepts that the statements were available, triggering Osuji's duty to review and "promptly" notify Wells Fargo of any unauthorized payments. The consequences of failure are the preclusion of claims not asserted within 30 days of a statement date and for subsequent transactions by the same offender that could have been prevented by timely notice. (*See* Agreement pgs. 8-9.)

The initial 30-day time limitation is not manifestly unreasonable, reflecting an interest in expeditiously stopping fraudulent acts and minimizing losses from bank fraud. In charging a

customer with a duty to promptly file claims, the UCC recognizes that "[o]ne of the most serious consequences of failure of the customer to comply with [notice requirements] is the opportunity presented to the wrongdoer to repeat the misdeeds." *See N.J.S.A.* 12A:4-406 cmt. 2. Conversely, because the customer is in a superior position to identify unauthorized transactions, "one of the best ways to keep down losses in this type of situation is for the customer to promptly examine the statement and notify the bank of an unauthorized signature or alteration so that the bank will be alerted to stop paying further items." *Id.* Directing a customer to do so within 30 days does not present an unreasonable burden, and similar requirements have been routinely upheld by other courts. *See e.g.*, *Estate of Yahatz v. Bank of Am., N.A.*, No. L-1607-13, 2015 WL 8546799, at * 3 (N.J. Sup. Ct. App. Div. Dec. 14, 2015) (60-day notice requirement); *Graves v. Wachovia Bank, N.A.*, 607 F. Supp. 2d 1277, 1280 (M.D. Ala. 2009) (40 days); *Freese v. Regions Bank, N.A.*, 644 S.E.2d 549, 552 (Ga. Ct. App. 2007) (30 days); *Borowski v. Firstar Bank Milwaukee, N.A.*, 579 N.W.2d 247, 251-52 (Wis. Ct. App. 1998) (14 days).

Nor is there any evidence that holding Osuji to her contractual obligations would allow Wells Fargo to disclaim responsibility for "lack of good faith or failure to exercise ordinary care." *See N.J.S.A.* 12A:4-103. Several courts addressing whether a time limit on a customer's claim against the bank allows the bank to shirk its duty of care have analogized such limits to either statutes of limitations or conditions precedent. *See e.g.*, *Bank of America, N.A. v. Putnal Seed & Grain, Inc.,* 965 So.2d 300, 301 (Fla. Ct. App. 2007) (finding that 60-day time limit did not "absolve the bank of its duty to exercise ordinary care," but "create[d] a condition precedent which [company] must comply with before it may seek reimbursement."); *Keiting v. Skauge,* 543 N.W.2d 565, 568 (Wis. Ct. App. 1995) (contract provision not exculpatory because it "merely alters the limitations period which the law would otherwise impose."). As these and several other courts

9

have concluded, statutes of limitations or conditions precedent do not alter the standard of care that the bank owes its customers but control the circumstances for bringing a claim. The Court is not aware of any New Jersey cases adopting analogous reasoning. *See Estate of Yahatz*, 2015 WL 8546799, at * 3 (noting that if customer's claim is precluded by a time limitation, "customer may still 'prove[ ] that the bank failed to exercise ordinary care in paying the item'") (quoting *N.J.S.A.* 12A:4-406(e)) (modification in original). However, even if New Jersey does not enforce time limitations in cases of negligence, this does not help Plaintiffs because they have presented no evidence to show that Wells Fargo failed to exercise ordinary care in paying the checks to Metal Building Associates.

The Code defines "ordinary care" as the "observance of reasonable commercial standards, prevailing in the area in which the person is located[.]" *N.J.S.A.* 12A:3-103(a)(7), :4-104(c). To prove that a bank failed to exercise ordinary care, a customer must show that "the bank's procedures were below standard or that the bank's employees failed to exercise care in processing the items." *N.J. Steel Corp. v. Warburton*, 655 A.2d 1382, 1387 (N.J. 1995) (quoting *First Nat'l Bank & Trust Co. v. Cutright*, 205 N.W.2d 542, 545 (Neb. 1973)). Plaintiffs have offered no evidence of Wells Fargo's procedures generally or as performed in these specific transactions,[7] alleging, at most, that Wells Fargo did not comply with reasonable commercial standards and did not visually inspect the signature on the fraudulent checks and compare it to Osuji's signature that the bank had on file. (Osuji Dep. 204:4-19.) Mere allegations about non-adherence to appropriate standards carry no evidentiary weight. *See Anderson*, 477 U.S. at 248. Moreover, a bank may comply with the duty of ordinary care without engaging in sight examination. *N.J.S.A.* 12A:3-

---

[7] Plaintiffs do not appear to have intended to pursue this line of inquiry in discovery, communicating that they have concluded their depositions. (*See* Marks Decl. ¶6 and Exs. A, B.)

103(a)(7) ("reasonable commercial standards do not require the bank to examine the instrument if the failure to examine does not violate the bank's prescribed procedures and the bank's procedures do not vary unreasonably from general banking usage not disapproved by this chapter or chapter 4."). Without proof of negligence by Wells Fargo in honoring the checks at issue, Osuji is precluded from contesting checks No. 103 and No. 107 that were paid on May 25, 2012, and June 8, 2012, and documented on her June 11, 2012, statement because she did not notify Wells Fargo of the fraud within 30 days of that statement.

Osuji's failure to report the first two unauthorized transactions limits her right to recover for subsequent fraud. As noted above, the foremost concern addressed by the requirement for prompt notification is the prevention of continued fraud by the same transgressor. *N.J.S.A.* 12A:4-406 cmt. 2. Thus, the UCC and the Customer Agreement bar a customer's ability to recover for "unauthorized transactions committed by the same person . . . that could have been prevented" if the customer had complied with her duties to timely examine statements and inform the bank of the initial unauthorized payment. (Agreement at p. 9) (emphasis removed); *N.J.S.A.* 12A:4-406(d)(2) (a customer is precluded from asserting an "unauthorized signature or alteration by the same wrongdoer on any other item paid in good faith by the bank if the payment was made before the bank received notice from the customer of the unauthorized signature or alteration and after the customer had been afforded a reasonable period of time, not exceeding 30 days, in which to examine the item or statement of account and notify the bank.")

If Osuji had apprised Wells Fargo of the two forged checks disclosed on her June 11, 2012, statement within 30 days, subsequent payments to Metal Building Associates made on July 17, 2012 (No. 129), July 18, 2012 (No. 133), and July 27, 2012 (No. 135), may have been avoided, making it precisely the kind of loss that the UCC and the Customer Agreement sought to prevent.

Consequently, Osuji may not recover for these transactions even though she reported the items to Wells Fargo on August 14, 2012, within 30 days of the August statement on which they would have appeared. (*See* Agreement at p. 9.)

The only remaining check is No. 111, which was paid on June 25, 2012. Even if Osuji had timely reviewed her June 11, 2012, statement and contacted Wells Fargo within the allotted period, by approximately July 12, 2012, her compliance may not have stopped this payment. The Agreement's "repeater" provision thus does not block her from challenging the June 25, 2012, check. This check may nevertheless be barred by the 30-day notice requirement, but more evidence is needed make this determination. Unlike the first two statements, which Osuji requested to receive online, Osuji opted for mail delivery commencing with the statement that would have reflected the June 25 check. (Abatemarco Decl. ¶ 6 and Ex. D.) The statement's mailing date thus triggered the running of the 30 day clock. Wells Fargo did not specify the mailing date, which, if only a few days after the July 11 statement end date, could have fallen within 30 days of August 14, 2012, when it appears that Wells Fargo became aware of the fraud.[8] Thus, the timeliness of Osuji's notification of fraud on Check No. 111 is a disputed issue of material fact. Osuji's claims as to the remaining checks are barred by her Agreement with Wells Fargo.[9]

---

[8] Wells Fargo notes that statements remained accessible to Osuji via online banking. (Abatemarco Decl. ¶ 6.) However, the question of whether online availability of statements to a customer who did not request online access counts as "available" for the purposes of preclusion was not raised by the parties.

[9] The Second Amended Complaint also charges Wells Fargo with breach of contract and violations of transfer warranties. Plaintiffs' breach of contract claim, alleging that Wells Fargo failed to "safely maintain Ms. Osuji's account, and to ensure that fraudulent instruments were not honored," is covered by the analysis above. SAC ¶ 34. The section 4-207 transfer warranty, made by a "customer or collecting bank that transfers an item . . . to the transferee and to any subsequent collecting bank," is not applicable. *N.J.S.A.* 12A:4-207. As the payor/drawee bank, Wells Fargo does not transfer the instrument and does not make the transfer warranty. As a drawer or issuer of the check, Osuji is not the warranty recipient.

Finally, Osuji's sister, Constance Oguguo, is not a proper Plaintiff in this action. Oguguo deposited money into Osuji's account. As far as the Defendant banks are concerned, her interest in the funds ended there. The alleged fraud involves forged checks drawn on Osuji's account. The UCC and the Account Agreement apportion the losses of check fraud, as may be applicable under the circumstances, between the account holder and the banks involved in the collection process. The loss allocation system makes no provisions for a party who happens to fund the drawer's account, whatever that person's intent respecting the money may have been. *See Bank Polska Kasa Opieki, S.A. v. Pamrapo Sav. Bank, S.L.A.*, 909 F. Supp. 948, 956 (D. N.J. 1995) ("[t]he Uniform Commercial Code provides a comprehensive framework for allocating losses when a forged check enters the negotiation process.") Oguguo was not a customer of Wells Fargo,[10] and banks owe no duties to a non-customer in the absence of a special relationship, which may arise out of an "agreement, undertaking, or contact." *City Check Cashing, Inc. v. Mfrs. Hanover Trust Co.*, 764 A.2d 411, 417 (N.J. 2001). No evidence that Wells Fargo assumed any obligations to Oguguo exists.

For the foregoing reasons, the Court will grant Wells Fargo's motion for summary judgment except as to Check No. 111, paid on June 25, 2012, because a question of material fact exists as to the timeliness of Osuji's notice of fraud. The Court will deny Wells Fargo's motion for summary judgment on Count Four of the Second Amended Complaint as to check 111 only. Judgment will otherwise be entered in favor of Wells Fargo on all other claims.

---

[10] Plaintiffs allege that Oguguo also maintained an account at Wells Fargo and transferred some of the money from her Wells Fargo account to Osuji's Wells Fargo account. This is of no consequence. Wells Fargo's duties concerning the funds in Osuji's account, regardless of the source, run solely to Osuji.

### C. Claims Against PNC

The allegedly forged checks ostensibly from Osuji were deposited into the PNC account of Metal Building Associates, Inc. PNC transmitted the instruments for payment to Wells Fargo. Plaintiffs allege that PNC violated a presentment warranty in section 4-208 because it had knowledge of the fraudulent signatures. SAC ¶¶ 44-45. Under section 4-208, the person obtaining payment of a draft

> warrant[s] to the drawee that pays or accepts the draft in good faith that: (1) the warrantor is, or was . . . a person entitled to enforce the draft or authorized to obtain payment . . .; (2) the draft has not been altered; and (3) the warrantor has no knowledge that the signature of the purported drawer of the draft is unauthorized.

*N.J.S.A.* 12A:4-208. The presentment warranty is made to the *drawee*, the person ordered in a check to make payment, here, Wells Fargo, which gives Plaintiffs no rights to assert a breach. *Id.*, *N.J.S.A.* 12A:4-104, :3-417 cmt. 2 (discussing analogous warranty in section 3-417: "[t]here is no warranty made to the drawer . . . when presentment is made to the drawee"); *see also Bank Polska*, 909 F. Supp. at 955 (holding that UCC warranty claims do not run to drawers like Osuji).

Although framed as a claim for the breach of presentment warranty, Plaintiffs' submissions make clear that they seek to hold PNC liable for negligently opening the bank account of Metal Building Associates, Inc., allegedly without obtaining adequate documentation, and for negligently failing to recognize the checks as forgeries. To the extent that the Second Amended Complaint attempts to state a negligence claim, as the Court specified in its June 17, 2014, Order, the UCC precludes any cause of action in common law negligence because the UCC provides a comprehensive remedy for losses relating to bank transactions involving forged checks. In cases involving a forged drawer's signature, Osuji's loss is allocated between the drawee and the customer, falling initially on Wells Fargo for paying an instrument that was not "properly

14

payable," and subject to defenses for the customer's comparative negligence, including the failure to bring a timely claim. *Brighton, Inc. v. Colonial First Nat'l Bank*, 422 A.2d 433, 440 (N.J. Super. Ct. App. Div. 1980); *N.J.S.A.* 12A:4-401, -406. PNC, as the depository bank has "no duty, and indeed no means, to check the genuineness of a drawer's signature," and may bear the loss only in the rare circumstances where the presenting bank has "knowledge that the signature of the purported drawer of the draft is unauthorized." *See Brighton*, 422 A.2d at 441; *N.J.S.A.* 12A:4-208. There is no evidence to suggest that PNC had knowledge. Accordingly, the Court will grant PNC's motion for summary judgment.

### III. CONCLUSION

For the foregoing reasons, the Court will grant in part Wells Fargo's motion for summary judgment. The Court will grant Wells Fargo's motion for summary judgment as to all checks except No. 111, paid on June 25, 2012. The Court will grant PNC's motion for summary judgment on all Plaintiffs' claims. An appropriate Order will be filed.

       s/ Stanley R. Chesler
       STANLEY R. CHESLER
       United States District Judge

Dated: May 27, 2016